UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br>vs.<br>FRANCISCO VILLANUEVA,<br><br>               Defendant. | 5:17-CR-50049-JLV<br><br>REPORT AND RECOMMENDATION |

Pending is Defendant's Motion to Suppress Evidence (Doc. 107). A hearing was held on Wednesday, August 29 and Thursday, August 30, 2018. Defendant was personally present and represented by his attorney of record, Robert Rohl. The Government was represented by Assistant United States Attorneys Sarah Collins and Kathryn Rich. Denver Police Officers Vincent Lombardi, Jason Simmons, Andrew Nielsen, Bruce Kay, Douglas Grove, and Joseph Hamel testified at the hearing. Five exhibits were received into evidence. Supplemental briefing concluded on January 11, 2019. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## **RECOMMENDATION**

It is respectfully recommended that Defendant's Motion to Suppress be denied.

## JURISDICTION

Defendant is charged in a Second Superseding Indictment with First Degree Murder (Premeditated) and First Degree Murder (Felony Murder), in violation of 18 U.S.C. §§ 1111(a), 2, 1152 & 1153; Conspiracy to Commit Assault, in violation of 18 U.S.C. §§ 113(a)(3), 1152, 1153, & 371; Use of a Firearm during a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); and Possession of Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1).  The pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's Standing Order dated April 1, 2018.

## FACTUAL BACKGROUND

Denver Police Department ("DPD") Sergeant Vince Lombardi, Sergeant Jason Simmons, Officer Andrew Nielsen, Officer Bruce Kay, Sergeant Douglas Grove, and Detective Joseph Hamel participated in the arrest of Defendant Francisco Villanueva in Denver, CO on November 28, 2017 and testified at the evidentiary hearing.  The officers all have experience working with Denver's gangs and are familiar with the gangs operating within Denver's Cole-Whittier neighborhood, where Defendant was arrested.  Specifically, at the time of Defendant's arrest, Sergeant Lombardi had 29 years of experience in law enforcement, 20 of which have been with the DPD gang unit.  (Doc. 248 at p. 5).  Sergeant Simmons had 20 years of experience with the DPD and Broomfield Police Department and had served in the gang unit.  (Id. at p. 51).  Officer Nielsen had worked for DPD since 2014 and had been exclusively

assigned to the Cole-Whittier neighborhood. (Id. at p. 71). Officer Kay had 14 years of experience with DPD and was a member of the gang unit at the time of Defendant's arrest. (Id. at p. 90–91). Sergeant Grove had 21 years of experience, 12 of which were with DPD, and at that time was a sergeant with the Vice and Narcotics Bureau which assists the gang unit with surveillance. (Id. at p. 107). Detective Hamel had two years of experience working in the Cole-Whittier neighborhood doing gang surveillance. (Doc. 251 at p. 9–10). Each officer testified that he is familiar with the neighborhood's East Side Oldies gang and its violent tendencies. The court finds the testimony of these officers credible.

On November 28, 2017, the DPD gang unit, vice team, and other officers worked a special operation in response to gang activity in the Cole-Whittier neighborhood. (E.g., doc. 248 at p. 7–9, 53, 72). The Crips gang and the East Side Oldies gang have a long-standing feud in the Cole-Whittier neighborhood, resulting in shootings and other gun-related violence. (Id. at p. 9, 53, 72). The testifying officers described removing firearms from Oldies members; encountering Oldies members who would attempt to flee from law enforcement; arresting Oldies members and having other gang members attempt to cause a distraction or fire rounds in order to allow the arrestees to flee; and Oldies members partaking in drive-by shootings, homicides, and other shootings. (E.g., id. at p. 5–7, 108–09, 114–15, 131). Members of the Crips gang had recently shot members of the East Side Oldies gang in the neighborhood, and Denver police received information that the Oldies planned to retaliate against

the Crips on the evening of November 28, 2017. (Id. at p. 7). During the operation, the Metro Gang Task Force ("MGTF") contacted the Denver Police Department and stated they had a federal arrest warrant for Francisco Villanueva. (Id. at p. 8). The arrest warrant emanated from the District of South Dakota and was for a homicide. (Id.). The warrant information showed Defendant as an active Oldies gang member. (Id.). Based on the information in the warrant, the tensions between the Crips and Oldies, and officers' experience with gang members carrying firearms and fleeing from law enforcement, the officers approached the arrest warrant with heightened concerns. (Id. at p. 8–9, 53, 72–73, 109, 111–12).

While MGTF conducted surveillance on Defendant's address at 1607 Martin Luther King Boulevard, the gang unit and vice team assembled to execute the warrant. (Id. at p. 9–10, 53–54). Approximately six to nine officers were involved in the surveillance. (Doc. 251 at p. 4). A male, matching the description of Defendant, left the home along with an unidentified female, and Officer Nielsen and his partner tailed the vehicle until it committed a traffic violation. (Doc. 248 at p. 11–12, 74–76). Officer Nielsen initiated a traffic stop and approached the vehicle. The officers discovered that the male was not Defendant. The female identified herself as Defendant's wife, Tabitha Bermudez Villanueva. (Id. at p. 78). Tabitha Villanueva informed Officer Nielsen that Defendant was present inside the home, along with her four-year-old son. (Id. at p. 12). This information was relayed to the other officers, who decided at that point to knock on the door and attempt the arrest. (Id. at p.

13). The entrance was barred by a locked security door, so the officers decided to employ a ruse to get Defendant to come outside and to separate him from anyone else inside the home. (Id. at p. 15, 92, 94–95).

Sergeant Lombardi, Officer Kay, and Officer Jacob Robb approached the front door while other officers waited behind the house. (Id. at p. 13–14, 92). Officers Robb and Kay knocked on the front door. The officers knew what Defendant looked like from past experiences with him and from his mugshot. (Id. at p. 94). An unidentified male answered the door. The officers informed the male that Defendant's car was getting broken into, and the male called Defendant over to the door. (Id. at p. 15, 95). Defendant willingly exited the home and then complied with the arrest. (Id.; Ex. 2 at 1:00–1:15). Three other unknown males were present and visible through the front door. (Doc. 248 at p. 16). Immediately after Defendant was secured, the officers ordered the other three individuals to step out of the home, patted them down for weapons, and had them sit down on the front porch. (Id. at p. 16–17, 96; Ex. 2 at 1:15–2:00). Officer Kay transported Defendant to the city jail. (Doc. 248 at p. 96–97).

Once the three individuals sat down on the front porch, the officers began asking their names and dates of birth. (Ex. 2 at 2:40). An officer asked if anyone else was present in the home, and one of the individuals said, "My friend's stepson is inside," and told the officers the child was four years old. (Ex. 2 at 3:10–3:15; Doc. 248 at p. 17). The officers were uncertain if other dangerous individuals were inside the home as well. (Doc. 248 at p. 18–19). Based on officer safety concerns, as well as concerns for the welfare of the

5

child, Sergeant Lombardi immediately ordered a protective sweep of the home and welfare check of the child. (Id. at p. 21; Ex. 2 at 3:20; Ex. 3 at 00:40). The officers entered the home approximately two minutes after first knocking on the door. (Ex. 2).

Sergeant Lombardi, Sergeant Simmons, and Sergeant Grove entered the home to conduct the sweep. (Doc. 248 at p. 21). The officers discovered firearms in plain view, and searched any places where a human being could hide. (Id. at p. 22–23). The officers found no other occupants other than the child. (Id. at p. 23). Officer Nielsen returned to the home with Tabitha Villanueva and Tabitha's sister, Monica, to pick up the child and retrieve the child's clothes. (Id. at p. 81–83). Tabitha remained outside the home while Officer Nielsen and another officer escorted Monica inside. (Id. at p. 82). Officer Nielsen testified that law enforcement accompanied Monica to ensure that she did not tamper with any evidence. (Id.). Monica had trouble communicating with the child and told Officer Nielsen to ask Tabitha where the child's hearing aids were. (Id. at p. 83). Officer Nielsen returned outside to speak with Tabitha, and on his way out he observed, without manipulating the scene, a black semi-automatic handgun on top of the fridge. (Id.). Tabitha told Officer Nielsen that the hearing aids were on top of the dresser in the master bedroom. (Id.). While getting the hearing aids, Officer Nielsen observed another handgun on top of the dresser in the bedroom. (Id. at p. 84). Officer Nielsen then assisted Monica in carrying out three garbage bags of children's clothes. (Id.). Sergeant Groves passed this information along to Detective

Hamel, who promptly obtained a search warrant for the residence. (Doc. 251 at p. 7–8; Ex. 102). Nothing was removed from the home at that time other than the bags of children's clothes. (Doc. 248 at p. 84–85).

## **DISCUSSION**

Defendant argues law enforcement's entry into the home constituted a warrantless search without probable cause and no justification for a protective sweep existed. (Doc. 287). Defendant also argues evidence obtained as a result of the subsequent search warrant should be suppressed as fruit of the poisonous tree because the search warrant was based on observations made during the protective sweep. (Doc. 108 at p. 3). The government opposes the motion, arguing the four-year-old child's presence in the home justified immediate entry; the protective sweep was lawful and properly limited; the guns located during the sweep were in plain view; and law enforcement inevitably would have located the guns when Officer Nielsen entered the home at Tabitha Villanueva's request. (Doc. 266 at p. 2–11).

**I.     Choice of Law**

Defendant argues Tenth Circuit law controls the resolution of his motion because all events relevant to his argument occurred within Colorado. (Doc. 287 at p. 6–7). Defendant does not argue that venue is improper, but rather that Tenth Circuit law should apply to the protective sweep. Defendant argues that law enforcement within the Tenth Circuit should remain bound strictly by Tenth Circuit precedent. (Id. at p. 8). Because Defendant raised this argument

for the first time in his supplemental post-hearing brief, the government did not have the opportunity to respond.

Defendant urges this court to adopt the reasoning outlined in United States v. Gerena, 667 F. Supp. 911, 913 (D. Conn. 1987). There, Puerto Rico law enforcement received authorization from a Puerto Rico judge to conduct surveillance of defendants in Puerto Rico. The surveillance resulted in incriminatory statements relating to a robbery in Connecticut, and the defendants were charged in Connecticut for the robbery. The district court relied on First Circuit precedent in determining the legality of electronic surveillance because the surveillance occurred within the First Circuit, was conducted by law enforcement within the First Circuit, and was supervised by First Circuit district courts. Id. at 914–18. The court reasoned that law enforcement must be able to gauge its conduct under the applicable laws governing the surveillance, instead of attempting to predict a possible future forum. Id. at 918.

The Gerena court outlined the situations in which a court must undertake a choice-of-law determination:

> Like instrastate divisions, the division of the nation into circuits is an intrafederal jurisdictional scheme. To the extent that each circuit has its own body of binding precedent (uniformly regarded as binding only within defined jurisdictional limits) then, in the absence of authoritative Supreme Court disposition of the particular issue in question, differences among the circuits give rise to intrafederal disputes and thus genuine conflicts within the meaning of conflict of laws analysis, and require a choice to be made where the interests of the nonforum jurisdiction are significant.

Id. at 919.  Thus, where significant differences exist between the law of the jurisdiction hearing the challenge and the law of the jurisdiction in which the evidence was gathered, "the proper suppression standard to apply is that of the federal jurisdiction in which the allegedly illegal conduct took place." Id. at 924.  Other district courts have adopted this approach.  United States v. Barragan, 589 F. Supp. 2d 1012, 1015 (S.D. Ind. 2008); United States v. Ozuna, 129 F. Supp. 2d 1345, 1352 (S.D. Fla. 2001); United States v. Longo, 70 F. Supp. 2d 225, 262 (W.D.N.Y. 1999); United States v. Rohlsen, 968 F. Supp. 1049, 1053 (D.V.I. 1997); United States v. Restrepo, 890 F. Supp. 180, 191 (E.D.N.Y. 1995).  While none of these decisions are binding, the court finds their rulings instructive and will follow a similar approach in analyzing Defendant's argument.

Defendant attempts to distinguish Tenth Circuit and Eighth Circuit law regarding protective sweeps, and proposes that under Tenth Circuit law, his motion should be granted.  (Doc. 287 at p. 13–15).  However, the court finds that significant differences do not exist between Tenth Circuit and Eighth Circuit law.  The supposed differences that Defendant identifies are based on authoritative Supreme Court disposition of the particular issue in question.  The Tenth Circuit case which Defendant claims should control this issue directly relied on Maryland v. Buie, 494 U.S. 325 (1990) in reaching its decision.  United States v. Nelson, 868 F.3d 885, 888–891 (10th Cir. 2017).  In fact, the Eighth Circuit cited a Tenth Circuit decision in addressing a case factually similar to this one.  United States v. Alatorre, 863 F.3d 810, 814 (8th

9

Cir. 2017) (citing United States v. Cavely, 318 F.3d 987, 995–96 (10th Cir. 2003)). Because no significant differences exist between Tenth Circuit and Eighth Circuit law on the issues presented here, a choice-of-law determination is not necessary.

## II.   Protective Sweep

A protective sweep of a home is permitted under the Fourth Amendment under two circumstances. As an incident to an in-home arrest, officers may, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place or arrest from which an attack could be immediately launched." Maryland v. Buie, 494 U.S. 325, 334 (1990). Officers may also conduct a limited search of the premises if they possess "'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger[.]'" United States v. Cisneros–Gutierrez, 598 F.3d 997, 1006 (8th Cir. 2010) (quoting Buie, 494 U.S. at 334 (internal quotation marks omitted)). A protective sweep must be quick and limited to a cursory look at places where a person could be found. Buie, 494 U.S. at 335–36. "Buie does not allow a protective sweep for weapons or contraband." United States v. Waldner, 425 F.3d 514, 517 (8th Cir. 2005).

"Protective sweeps in these circumstances are justified because officers are vulnerable during an arrest at a home, even when the arrestee and other occupants have been secured[.]" United States v. Alatorre, 863 F.3d 810, 814

(8th Cir. 2017); see also Buie, 494 U.S. at 333 ("[U]nlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.'"); United States v. Davis, 471 F.3d 938, 944 (8th Cir. 2006) ("A protective sweep is justified by the threat of accomplices launching a surprise attack during an arrest and is particularly important during an in-home arrest, due to the heightened potential for an ambush in unfamiliar surroundings."). A protective sweep is not invalid simply because the defendant is removed from the immediate area before the sweep occurs. United States v. Waters, 883 F.3d 1022, 1026 (8th Cir. 2018); Alatorre, 863 F.3d at 814; United States v. Boyd, 180 F.3d 967, 975–76 (8th Cir. 1999).

"[T]he inquiry as to the reasonableness and validity of a protective sweep is necessarily fact-specific." Alatorre, 863 F.3d at 814 (citations and quotations omitted). "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" Brigham City v. Stuart, 547 U.S. 398, 404 (2006) (quoting Scott v. United States, 436 U.S. 128, 138 (1978)). "The officer's subjective motivation is irrelevant." Brigham City, 547 U.S. at 404. The government bears the burden of proving that the protective sweep exception to the Fourth Amendment's warrant requirement applies. United States v. Alatorre, 863 F.3d 810, 813 (8th Cir. 2017).

During a properly limited protective sweep, the police may seize an item that is in plain view if its incriminating character is "immediately apparent." Horton v. California, 496 U.S. 128, 136 (1990). Whatever "a person knowingly

11

exposes to the public . . . is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347, 351 (1967). Accordingly, an officer's "'mere observation of an item left in plain view . . . generally involves no Fourth Amendment search.'" United States v. Morgan, 842 F.3d 1070, 1075 (8th Cir. 2016) (quoting Texas v. Brown, 460 U.S. 730, 738 n.4 (1983)). "An officer does not violate the Fourth Amendment by viewing evidence from a position he lawfully occupies, remembering it, and using it later." Id.; see Arizona v. Hicks, 480 U.S. 321, 328–29 (1987).

Defendant attempts to distinguish his case from others authorizing protective sweeps, claiming "this [was] not an 'in-home arrest.'" (Doc. 287 at p. 13). Defendant further contends the protective sweep was unlawful because no specific facts could have provided the officers with a reasonable belief that the home harbored a dangerous individual. (Id. at p. 8–15). Defendant does not challenge the scope of the sweep. (Doc. 108 at p. 3; Doc. 287 at p. 2).

**A.   The Arrest Was In-Home**

Defendant claims that because Defendant was arrested on the porch, rather than within the house, Buie's first exception does not apply. However, although Buie involved an in-home arrest, the Eighth Circuit has recognized that arrests made just outside of a home can present the same security risks to officers as those outlined in Buie. Alatorre, 863 F.3d at 814 (upholding protective sweep of residence after defendant was arrested on front porch and secured, because officers had no way of knowing who else was inside the residence; guns and other weapons were conceivably present in the home,

12

given defendant's history of violent behavior; and officers on the front porch were vulnerable to attack from someone inside the residence); see also United States v. Davis, 471 F.3d 938, 944–45 (8th Cir. 2006) (upholding protective sweep of defendant's barn after arrest outside of barn); United States v. Boyd, 180 F.3d 967, 975 (8th Cir. 1999) (upholding sweep executed after defendant was handcuffed and removed from area).[1]

Here, although Defendant was arrested after he stepped onto the front porch, the officer safety concerns articulated in Buie apply. The arrest took place directly outside the home, and the officers were vulnerable to potential attacks from someone inside the residence. Therefore, Defendant's attempt to characterize the arrest as something other than an "in-home" arrest fails, and the officers were entitled to sweep the immediate area. Buie, 494 U.S. 325, 334. If the officers possessed a reasonable belief that the area harbored a dangerous individual, they further were entitled to conduct a limited protective sweep of the premises. Id.

### B. The Sweep Was Reasonable

Defendant contends the protective sweep was unlawful because officers could not have reasonably believed other dangerous individuals were present in

---

[1] Defendant argued Tenth Circuit law should apply on this point because "[u]nlike the 8th Circuit, the 10th Circuit clearly delineates the difference in legal standards that apply to "in-home" arrests versus "out-of-home" arrests[.]" (Doc. 287 at p. 13). As outlined in Section I, above, the Tenth Circuit case that Defendant points to relied on Buie in reaching its decision. Further, the Tenth Circuit has held "the same exigent circumstances present in Buie can sometimes accompany an arrest just outside of a residence or other structure. Depending on the circumstances, the exigencies of a situation may make it reasonable for officers to enter a home without a warrant in order to conduct a protective sweep." United States v. Cavely, 318 F.3d 987, 995 (10th Cir. 2003) (finding protective sweep reasonable where defendant was arrested outside back door of residence).

the residence.  Specifically, Defendant's arrest was accomplished quickly and without incident; Defendant was secured in the police vehicle before the sweep commenced; the other individuals complied to the fullest extent with law enforcement; between six and twelve officers surrounded the home; no evidence indicated the four-year-old child was in danger; and no evidence indicated anyone else was in the home.  (Doc. 287 at p. 8–15).  Defendant appears to argue that the officers should have possessed facts rising to the level of probable cause in order to lawfully enter the residence.  (Id. at p. 12–14).

Defendant does not dispute the government's summary of the facts supporting the officers' decision to conduct a protective sweep.  (Id. at p. 12 n.1).  While those facts may or may not have supported a probable cause determination, that analysis is irrelevant here.  The court finds "the protective sweep of the residence was justified by several *articulable facts and rational inferences* supporting the officers' *reasonable belief* that someone else could be inside posing a danger to them during or following the arrest."  Alatorre, 863 F.3d at 814 (emphasis in original) (citing Buie, 494 U.S. at 327).

These facts and inferences include: (1) the officers knew Defendant was a member of the East Side Oldies, a violent gang known for frequent gun violence, homicides, and noncompliance with law enforcement; (2) the officers were aware the Oldies planned to violently retaliate against the Crips that evening; (3) the officers knew Defendant had an outstanding arrest warrant for homicide; (4) given the Oldies' proclivity for gun violence, guns were

conceivably present in the home; (5) given the Oldies' known tendency to flee, cause distractions, or shoot at law enforcement, other dangerous persons conceivably were in the home and prepared to engage in violence; and (6) a four-year old child was unsupervised inside the home and any violent outburst would seriously endanger the child. Defendant argues no evidence showed anyone else was in the home, and the detainees only indicated the four-year-old child was inside. However, considering the officers' experience with gang members in the neighborhood, coupled with the specific facts of the arrest, the court finds it was entirely reasonable for the officers to believe other dangerous individuals could be inside the home. Alatorre, 863 F.3d at 814–15.

Thus, even though hindsight shows no one else was in the home, the officers were justified in conducting the protective sweep. Id. at 915. "While hindsight reveals that the officers had already encountered all of the occupants of the home before conducting the protective sweep, that information was not apparent to the officers when they initiated the sweep." United States v. Williams, 577 F.3d 878, 881 (8th Cir. 2009). Further, although Defendant was handcuffed before the officers entered the home, the sweep was conducted within a reasonable period of time after the arrest. United States v. Davis, 471 F.3d 938, 944 (8th Cir. 2006) (protective sweep "may be executed after an arrest if there is a reasonable possibility that other persons may be present on the premises who pose a danger to the officers").

Defendant proposes an alternative scenario, stating that law enforcement never should have entered the home. Rather, the officers should have waited

15

outside while Tabitha Villanueva was brought back to the home, and then should have left Tabitha alone with the child. (Doc. 287 at p. 15–17). Defendant fears that denial of his motion will eviscerate Fourth Amendment protections for parents of young children, allowing police to enter any home in which children are present. (Id. at p. 10). Defendant's argument ignores the concerns articulated in Buie, as well as the rule that protective sweeps require a fact-specific inquiry. In a high-crime neighborhood such as the one in this case, the Fourth Amendment does not require law enforcement to sit outside the home of a known gang member, with no information on who else is inside, waiting for a third-party custodian to come retrieve a child. To require such would put law enforcement in an incredibly dangerous position when the risk of ambush is already high. See Buie, 494 U.S. at 333. Contrary to Defendant's assertions, the presence of the child in the home constituted only one of the many factors making the protective sweep reasonable.

For these reasons, the officers' decision to conduct a protective sweep was objectively reasonable under the totality of the circumstances, and the firearms left in plain view were lawfully observed. The court need not determine whether the firearms inevitably would have been discovered. Because there was no initial constitutional violation, the evidence uncovered while law enforcement executed the search warrant was lawfully obtained.

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that Defendant's Motion to Suppress Evidence be denied in full.

## **NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require de novo review by the District Court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

DATED this 8th day of February, 2019.

BY THE COURT:

*[signature]*

DANETA WOLLMANN
United States Magistrate Judge